**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
JORDAN WENTWORTH and
DAVID WENTWORTH,

                    Plaintiffs,                             **OPINION AND ORDER**

                  -against-                            06-CV-3373 (RER)

EILEEN HEDSON and
WILLIAM HEDSON,

                    Defendants.
------------------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiffs Jordan and David Wentworth brought this action against their landlord Eileen

Hedson and her husband William under the Fair Housing Act of 1968, 42 U.S.C. §§ 3604(c) and

3617, the Civil Rights Act of 1866, 42 U.S.C. § 1982, and the New York Executive Law § 296.

Plaintiffs claim that defendants unlawfully interfered with their housing rights by harassing

them, disturbing the quiet enjoyment of their apartment, and instituting eviction proceedings

against them because they associated with people of African American or African Caribbean

descent.  Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56, arguing

that they did not harass or discriminate against plaintiffs, and that their actions were taken

because plaintiffs violated the terms of their lease by operating a voice studio out of their

apartment.  For the reasons set forth below, defendants' motion for summary judgment is

denied.[1]

---

[1] The parties have consented to have me preside over this case for all purposes pursuant
to 28 U.S.C. § 636(c)(1).

<u>FACTS</u>[2]

In the fall of 2002, the Wentworths rented an apartment from the Hedsons in a three-apartment building in Greenpoint, Brooklyn. Affidavit of Eileen Hedson ("E. Hedson Aff.") ¶ 3; Affidavit in Opposition, Jordan Wentworth ("J. Wentworth Aff.") ¶ 4. Upon entering into the first one-year lease, Jordan Wentworth informed the Hedsons that she was a voice teacher. E. Hedson Aff. ¶ 5; J. Wentworth Aff. ¶ 5. The Wentworth's lease was renewed "without incident in 2003, 2004 and 2005, with only one rent increase." E. Hedson Aff. ¶ 6; *see also* J. Wentworth Aff. ¶ 15 ("the Hedsons renewed our lease in the fall of 2003, and again in 2004, and again in 2005. At no time during that period, when we were renewing the lease or otherwise, did the Hedsons make any complaint about my use of the apartment for music lessons.").

Jordan Wentworth alleges that she informed the Hedsons when the first lease was signed that she "would be singing in the apartment on a daily basis *and giving voice lessons* in the apartment on a regular basis." J. Wentworth Aff. ¶ 5 (emphasis added). Mrs. Wentworth claims that from the time she and her husband moved in, she "gave voice lessons [in the apartment] on a regular basis . . ." *Id.* ¶ 6. Without specifically denying these claims, Eileen Hedson alleges that she "remember[s] early on in their tenancy being so surprised at how many friends [the Wentworths] had made in such a short time; there were always people coming to the apartment." E. Hedson Aff. ¶ 7. Mrs. Hedson claims that she "had no idea that many of these people were Jordan's students and that she was running a full-blown studio out of" the apartment. *Id.*

---

[2] The parties have not submitted statements of undisputed material facts pursuant to Local Civil Rule 56.1. Nevertheless, the following undisputed (and disputed) facts can be gleaned from the parties' respective declarations.

The Wentworths allege that the trouble between the parties began in earnest in January

2006, when Mrs. Wentworth began giving voice lessons to three black students.  J. Wentworth

Aff. ¶ 17.[3]  Mrs. Wentworth claims that on February 22, 2006, Mr. Hedson left a voice mail

message for her "in a hostile and aggressive tone, stating that if [she] did not stop having visitors

over we would be asked to move."  *Id.* ¶ 18.  According to Mrs. Wentworth, Mr. Wentworth

returned the call on February 24, 2006, and Mr. Hedson "yelled in return that we were having

too many visitors, were breaking the lease, and would be evicted."  *Id.* ¶ 19.  Mrs. Wentworth

also claims that Mr. Hedson "yelled" that if they did not stop having "these people" over he

would put them "out on the street."  *Id.*  The Wentworths claim that immediately after the

February 24, 2006, telephone conversation their intercom system "mysteriously stopped

working."  *Id.* ¶ 20.  The Hedsons deny that they had anything to do with the malfunctioning

intercom.

Mrs. Wentworth alleges that on February 25, 2006, Mr. Hedson shouted at one of her

Asian American students and refused to let him enter the building for his voice lesson.  J.

Wentworth Aff. ¶ 21.  Conversely, on March 1, 2006, Mrs. Wentworth states that she taught

---

[3] Mrs. Wentworth also refers to two earlier incidents in 2003 when the Hedsons
exhibited animosity toward her.  According to Mrs. Wentworth, "sometime in 2003" Mr. Hedson
told her not to let delivery people into the house because they were "immigrant trash."  J.
Wentworth Aff. ¶ 8.  Mrs. Wentworth says this exchange occurred not long after she had given a
voice lesson to an East Indian student.  It is not clear from her declaration whether the student is
black, or whether the Hedsons saw the student come into the house.  Mrs. Wentworth also
describes a telephone call she received from Mrs. Hedson in 2003 shortly after she taught "some
lessons" to a Nigerian student, and one of her younger students, who is presumably white, was
brought to the house by an African American man.  *Id.* ¶ 9.  According to Mrs. Wentworth, Mrs.
Hedson called "to say something about the people coming over to the apartment.  This was the
first comment ever, and had occurred after the first time people of African descent had visited
[the Wentworths] at the apartment."  *Id.*

lessons in the apartment to four students, all of whom are white, and none were either verbally

harassed or prevented from entering the building by Mr. Hedson.  *Id.* ¶ 22.

On March 2, 2006, Mrs. Wentworth claims that Mr. Hedson confronted one of her black

students as she was waiting in her car for Mrs. Wentworth to come down and let her in the

building.  *Id.* ¶ 23.  When she arrived downstairs, Mrs. Wentworth heard Mr. Hedson shout,

among other things, "you ain't letting up with those clients of yours.  You're gonna get thrown

out on the street."  *Id.*  According to Mrs. Wentworth, the trouble resumed a few days later, when

on March 29, 2006, Mr. Hedson stopped one of her "dark skinned" students and her father at the

door and told them they could be arrested for taking voice lessons in the apartment.  *Id.* ¶ 24.

On March 31, 2006, Mrs. Wentworth accidentally locked herself out of the house.

According to her, the Hedsons refused to let her in, and "yelled at [her] and mocked [her] over

the intercom, then stood at their front window laughing at [her] as [she] was locked out and in

distress."  *Id.* ¶ 25.  Mrs. Wentworth claims two of her students witnessed this.  *Id.*  The Hedsons

deny this ever happened.  *Id.*

Mrs. Wentworth claims that in April 2006, as she passed by a local pizza parlor, Mr.

Hedson came out and followed her home "at a close distance without speaking."  *Id.*  ¶ 26.  Mrs.

Wentworth alleges that as she sped up, so did Mr. Hedson.  Once she entered the house, Mrs.

Wentworth heard "loud banging on the wall, from inside the Hedsons' apartment [and] as [she]

rushed up the stairs, Mr. Hedson came in and slammed the front door shut."  *Id.*  Mrs.

Wenthworth felt intimidated and frightened by Mr. Hedsons' behavior.  *Id.*  Not unpredictably,

the Hedsons deny this ever happened.

Mrs. Hedson alleges that the trouble between the parties began in December 2003, when another tenant in the building, Elissa Maloney ("Maloney"), had a heart attack and became homebound for an extended period of time. E. Hedson Aff. ¶ 8. According to Mrs. Hedson, Maloney complained that the noise coming from the Wentworth's apartment had become "unbearable." *Id.*[4] Mrs. Hedson alleges that she relayed Maloney's complaints to Mrs. Wentworth, and asked her if she was running a voice studio out of the apartment. *Id.* ¶ 11. According to Mrs. Hedson, Mrs. Wentworth said "that she had lost her studio in Manhattan and was looking for another one, and that in a week or two the whole thing would be over." *Id.* ¶ 12. Mrs. Wentworth denies that this conversation ever took place. J. Wentworth Aff. ¶ 13.

Mrs. Hedson alleges that in "December of 2005 or January of 2006 [] things really began to deteriorate between the parties." E. Hedson Aff. ¶ 14. By that time, Maloney "was again home sick for an extended period and began complaining to [the Hedsons] about the constant noise and traffic coming in and out of the apartment." *Id.* Maloney claimed that "it sounded as if they were right in her living room, and that she could hear the 'la-la-la-la-la-la' for several hours a day, every single day." *Id.* ¶ 15. Upon hearing of Maloney's renewed complaints, Mrs. Hedson, who claims to be disabled and cannot climb stairs, "decided [she] would at least go out into the hallway to see if [she] could hear the singing, and [she] could." *Id.* ¶ 16. Mrs. Hedson also claims that around this same time she would see "people" loitering in front of the building "all day long and that [it] would make [her] dog bark like crazy." *Id.* ¶ 17. The alleged loitering made Mrs. Hedson feel unsafe. *Id.*

---

[4] Mrs. Hedson alleges that Maloney had complained "once or twice before", but that she asked Maloney to "let it go, so [she] never bothered to say anything to [the Wentworths] about those complaints." E. Hedson Aff. ¶ 9.

Without relaying Maloney's or her complaints to the Wentworths, in January 2006 Mrs.

Hedson started to keep a log of the number and frequency of students coming to the

Wentworth's apartment for voice lessons. *Id.* ¶ 18. Through March of that year, Mrs. Hedson

claimed that on average 50 to 60 students came to the apartment for lessons each month. *Id.*

According to the log, however, the average number of students per month was 42, or just over

ten per week. *Id.*, Exh. 5.[5] At some point after Mrs. Hedson began keeping the log, Mr. Hedson

left a message for for Mrs. Wentworth "about the noise and traffic and asked her to please stop

running her singing studio out of the apartment or else" they may be asked to move out. *Id.* ¶ 19.

After Mr. Hedson left this message, the Hedsons allege that David Wentworth telephoned and

"yelled" at Mr. Hedson "about threatening [Mrs. Wentworth] and saying that if they could not

run their studio out of the apartment that he would stop paying rent." *Id.* ¶ 20.

By March 1, 2006, things had deteriorated to the point where the Hedsons felt it

necessary to commence an eviction proceeding against the Wentworths. E. Hedson Aff. ¶¶ 22-

23; J. Wentworth Aff. ¶ 27. The Hedsons argue that the eviction proceeding was commenced

because: (1) Jordan Wentworth refused to stop using the apartment to teach voice lessons; (2) the

Wentworths had performed alterations to the apartment without the Hedsons' consent; and (3)

the Wentworths were storing personal items in a common hallway. E. Hedson Aff. ¶ 22, Exhs. 6

& 7; J. Wentworth Aff. ¶ 27.[6] The Wentworths argue that the Hedsons' reasons for commencing

_____

[5] Mrs. Wentworth claims that she never gave more than fifteen lessons per week during
the entire period she and her husband rented the apartment. J. Wentworth Aff. ¶ 7.

[6] The Hedsons claim that shortly before the eviction proceeding was commenced, the
Wentworths began carrying around a video camera and making rude comments to them, "hoping
to get a response from [the Hedsons] on tape." E. Hedson Aff. ¶ 24.

the eviction proceeding were a pretext, and that the proceeding was motivated solely, or at lease

in substantial part, by discrimination.  J. Wentworth Aff. ¶¶ 27-30.  During the pendency of the

eviction proceedings, the Wentworths claim their names were removed from the intercom

nameplate on the front of the building, and a new mailbox was installed to which only the

Hedsons had access.  J. Wentworth Aff. ¶¶ 31, 34.  The eviction proceeding continued in

housing court until July 2006, when the Wentworths brought this action by way of an order to

show cause seeking, *inter alia*, an order preliminary enjoining the eviction proceeding.[7]

DISCUSSION

I.      Applicable Legal Standards

     A.      Summary Judgment

A motion for summary judgment will be granted where there is no genuine issue as to

any material fact and it is clear that the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the

moving party to demonstrate the absence of a genuine issue of material fact.  *Am. Int'l Group,*

*Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981).  In addition, the court must

resolve all ambiguities and draw all reasonable inferences in favor of the opposing party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If, however, the opposing party fails

to make a showing of an essential element of its case for which it bears the burden of proof,

summary judgment will be granted.  *Celotex*, 477 U.S. at 323; *Smith v. Half Hollow Hill Cent.*

*Sch. Dist.*, 349 F. Supp. 2d 521, 524 (E.D.N.Y. 2004).

---

[7] On July 20, 2007, the preliminary injunction was resolved on consent on the record.
The parties subsequently filed a stipulation that was "so ordered" by the Court.

To overcome a motion for summary judgment, the opposing party must show that there is a genuine issue of material fact that is in dispute. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A fact issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the opposing party does not set forth specific facts showing that there is a genuine issue for trial, summary judgment is appropriate. FED. R. CIV. P. 56(c).

B.      Fair Housing Act

Fair Housing Act claims are evaluated under the *McDonnell Douglas* burden-shifting framework. *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979). Accordingly, once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory rationale for the challenged action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the defendant articulates a nondiscriminatory reason for the challenged action, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action. *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). A plaintiff can do this by showing "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Schnabel*, 232 F.3d at 90. Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination. *E.g., Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

Section 3604(c) of the Fair Housing Act prohibits making, printing or publishing "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). The governing regulations interpret this provision to cover "all written or *oral* notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75 (empahsis added); *see also Soules v. HUD*, 967 F.2d 817, 824 (2d Cir. 1992) ("Openly discriminatory *oral* statements merit . . . straightforward treatment.") (emphasis added). Thus, to establish a prima facie claim under section 3604(c), plaintiffs must prove that: (1) defendants made a statement; (2) the statement was made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on the basis of race. *See* 42 U.S.C. § 3604(c).

Section 3617 of the FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [inter alia ] . . . Section 3604." 42 U.S.C. § 3617. The implementing regulations interpret section 3617 to cover "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling *because of the race, color*, religion, sex, handicap, familial status, or national origin *of such persons, or of visitors or associates of such persons*." 24 C.F.R. § 100.400(c)(2) (emphasis added). To establish an FHA claim under § 3617 in the context of this case, plaintiffs must demonstrate (1) that they aided or encouraged members of a protected class in the exercise or enjoyment of their FHA rights, and (2) that as a

9

result of their actions, they suffered coercion, intimidation, threats, interference or retaliation. *See, e.g.*, *Berlickij v. Town of Castleton*, 248 F. Supp. 2d 335, 346 (D. Vt. 2003).

II.     Defendants' Motion for Summary Judgment Is Denied

        A.      Defendants Failed to Comply with The Local Rules

Rule 83 of the Federal Rules of Civil Procedure authorizes a District Court to adopt local rules of practice.  Pursuant to this authority, the Southern and Eastern Districts of New York have adopted Local Rule 56.1, which establishes requirements for the submission of and opposition to motions for summary judgment under Fed. R. Civ. P. 56.  Local Civil Rule 56.1 provides in pertinent part:

> (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, *there shall be annexed to the notice of motion a separate, short and concise statement*, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. *Failure to submit such a statement may constitute grounds for denial of the motion.*

(emphasis added).

In this case defendants failed to file (and presumably serve) a statement pursuant to Local Rule 56.1.  On that basis alone, the Court would be justified in denying the motion.  *E.g., Searight v. Doherty Enters., Inc.,* No. 02 Civ. 0604, 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005) (denying summary judgment motion for failure to comply with Local Rule 56.1); *Stone v. 866 3rd Next Generation Hotel, L.L.C.*, No. 00 Civ. 9005, 2002 WL 482558, at *1 n. 2 (S.D.N.Y.  Mar. 29, 2002) (same); *see also Holtz v. Rockefeller & Co., Inc.*, 258 F.2d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local rules.").  However, as set forth below, there exist material issues of fact which preclude summary judgment.  Accordingly, the motion is denied on the merits.

10

B.       Defendants Are Not Entitled to Summary Judgment

1.       Plaintiffs' Claim Under 42 U.S.C. § 3604(c)

Before addressing the Hedsons' principal arguments, I will address two threshold

arguments that they make in passing. Apparently relying on the standard applicable to a claim

under 42 U.S.C. § 3604(a), defendants argue that plaintiffs' section 3604(c) claim cannot stand

because: (1) as whites, plaintiffs are not members of a protected class; and (2) they were not

denied the opportunity to rent an apartment from defendants. Memorandum of Law in Support

of Defendants' Motion Seeking an Order Granting Summary Judgment Dismissing The

Complaint ("Defs' Br.") at 12. These arguments are misplaced for two reasons.[8]

First, a plaintiff need not be a member of a protected class in order to bring suit under

this section of the Fair Housing Act. It has long been held that whites have standing to sue under

section 3604(c) for discriminatory statements made against non-whites. *See Trafficante v.*

*Metropolitan Life Ins. Co.*, 409 U.S. 205, 208-12 (1972) (because Congress intended to define

standing under the Civil Rights Act of 1964 as broadly as possible under Article III, the Fair

Housing Act confers standing on white resident of housing unit who had been injured by racial

discrimination against blacks in the management of the facilities); *United States v. Gilman*, 341

F. Supp. 891, 896-97 (S.D.N.Y. 1972) (landlord's statement to white tenant that she should send

---

[8] Relying on *Passanante v. RY Mgmt Co., Inc.*, No. 99 Civ. 9760 (DLC), 2001 WL 123858 (S.D.N.Y. Feb. 13, 2001), defendants argue that to "prove a violation of the Fair Housing Act" plaintiffs must show that: (1) they belong to a protected class; (2) they sought and were qualified to rent the apartment; (3) they were denied the opportunity to rent the apartment; and (4) the apartment remained available. Defs' Br. at 12. *Passanante* involved, *inter alia*, a claim under 42 U.S.C. § 3604(a). 2001 WL 123858, at *4. This case does not involve a violation of section 3604(a), from which defendants are statutorily exempted. *Passanante*, and the standard enunciated therein, are thus inapplicable here.

her friends over to see vacant apartment but to "make sure her friends are whites" held to violate 42 U.S.C. § 3604(c)); *see also Stewart v. Furton*, 774 F.2d 706, 708-10 (6th Cir. 1985) (lessor's statement to prospective white tenant that black tenants were not allowed in trailer park because white tenants would move out was held to violate 42 U.S.C. § 3604(c)); *United States v. L & H Land Corp.*, 407 F. Supp. 576, 578-80 (S.D. Fla. 1976) (statements to white tenants that no blacks lived in development and were not allowed there even as guests was held to violate 42 U.S.C. § 3604(c)); *cf. Woods-Drake v. Lundy*, 667 F.2d 1198, 1200-01 (5th Cir. 1982) ("It is well established that whites have a cause of action under [the civil rights laws] when discriminatory actions are taken against them because of their association with blacks."). Thus, the fact that plaintiffs are white is not a bar to their claims under section 3604(c).

Second, section 3604(c)'s protections are not limited to housing transactions or to prospective tenants. In *United States v. Space Hunters, Inc.*, the Court of Appeals for the Second Circuit made clear that nothing in section 3604(c)'s language limits the statute's reach to statements that directly affect a housing transaction. 429 F.3d 416, 424 (2d Cir. 2005); *see also Housing Rights Center v. Donald Sterling Corp.*, 274 F. Supp. 2d 1129, 1142 (C.D. Cal. 2003) ("Certainly a discriminatory statement . . . violates § 3604(c), even if not made at the moment of first sale or rental."). In *Space Hunters*, the Second Circuit rejected as too narrow "the district court's view that section 804(c)'s purpose is to 'prevent expressions that result in the denial of housing.'" 429 F.3d at 424. In fact, the Second Circuit has permitted plaintiffs to recover for discriminatory advertising even when the plaintiffs were not in the market for housing. *See Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 903-04 (2d Cir. 1993). Thus, even

12

though the Wentworths were not denied the right to rent the apartment from the Hedsons, they

are still able to make out a prima facie case under section 3604(c).

Defendants' principal arguments for summary judgment on plaintiffs' section 3604(c)

claim are: (1) that plaintiffs have failed to produce a single instance of defendants publicizing an

intent to discriminate, Defs' Br. at 13-15; and (2) defendants had a legitimate, nondiscriminatory

reason for their actions – "safety and quiet," *id.* at 15.  These arguments are discussed in turn.

a.      <u>Prima Facie Case</u>

Defendants argue that because there is no proof that they (1) ever used racial slurs with

respect to the Wentworth's minority students or (2) "harassed" the Wentworth's nonstudent

visitors, the Wentworths have failed to establish a prima facie claim under section 3604(c).

Defs' Br. at 13-15.  Put differently, defendants argue that because it is alleged that they made

only "vague remarks" aimed exclusively at Mrs. Wentworth's students, there is no proof of

intentional discrimination.  This argument is misplaced for two reasons.

As plaintiffs correctly argue, "[t]hat statements are not facially discriminatory [] does not

mean that they do not indicate an impermissible preference *in the context* in which they were

made." *Soules*, 967 F.2d at 825 (emphasis added).  In other words, racial slurs are not necessary

to establish a violation of section 3640(c).  In cases involving "vague remarks," context and

timing are everything.  Here, while the Wentworths admit that the Hedsons did not use any racial

slurs, they allege that the harassing and discriminatory comments occurred almost exclusively

when black students would visit.  Plaintiffs' Memorandum of Law in Opposition to the Motion

13

for Summary Judgment ("Pls' Br.") at 8-9.[9]  Of course, the Hedsons are entitled to dispute the

facts asserted by the Wentworths; but they cannot obtain summary judgment simply by doing so.

In addition, the fact that the Hedsons may not have harassed[10] the Wentworth's

nonstudent visitors is immaterial.  *See* Defs' Br. at 13, 15 ("neither plaintiff could identify an

alleged incident of harassment towards a non-student visitor to the premises.").  What the

Hedsons ignore is that the Wentworths claim that they did not have any *minority* nonstudent

visitors.  Affidavit in Opposition, David Wentworth ("D. Wentworth Aff.") ¶ 13 ("The problem

with this argument is that I do not believe that we had any minority friends over to the

apartment.").  Nothing in the Hedsons' or Ms. Maloney's deposition transcripts refutes that

claim.[11]  Therefore, even if the Hedsons did not harass the Wentworths' nonstudent visitors, that

would not undercut a finding (or at least an inference) that the Hedsons discriminated against the

Wentworths because they entertained minority students in their apartment.

---

[9] *See also*  J. Wentworth Aff. ¶ 10 ("This was the first comment ever, and had occurred after the first time people of African descent had visited me at the apartment."), ¶ 17 ("I had three new voice students who are black, coming to the apartment for lessons.  This was when everything changed."), ¶ 22 ("On March 1, 2006, I had four students over for lessons, all of whom were white, and none of whom were stopped by Mr. Hedson.").

[10] Throughout this opinion I use the different forms of the word "harass" not to indicate nondiscriminatory conduct, but merely to refer to the conduct allegedly attributable to the Hedsons.  Of course, harassment can, and often does, constitute discrimination.  Whether it does so in this case will be an issue of fact for a jury to decide.  Accordingly, I reject the Hedsons' argument that because the Wentworths used the different forms of the word harass more often than discrimination to describe the Hedsons' conduct, that somehow undercuts the Wentworths' claim that the Hedsons discriminated against them.  Defs' Br. at 15-16.

[11] *See also* Deposition of Elissa Lee Maloney, at 15:
Q:      So when you say, "I've seen people of various races and cultures visiting Jordan's apartment," who did [] you think they were?
A:      Clients.
Q:      What kind of clients?
A:      Vocal lesson clients.

Equally meritless is the Hedsons' argument, tacitly made, that they were equal

opportunity harassers. Memorandum of Law in Reply to Plaintiff's Opposition of Defendants'

Motion Seeking an Order Granting Summary Judgment Dismissing The Complaint ("Defs'

Reply") at 9 ("It also appears from plaintiffs' own testimony that the defendants did not

'discriminate' against minority students, *but rather 'harassed' all students that came to the*

*apartment*." (emphasis added)). There is a genuine dispute of fact on this issue. *See* J.

Wentworth Aff. ¶ 22 ("On March 1, 2006, I had four students over for lessons, all of whom were

white, and none of whom were stopped by Mr. Hedson.").[12] Moreover, what matters is whether

the harassment that is visited upon members of different races or genders is truly equal in terms

of, *inter alia*, prevalence, severity and impact. *See, e.g., Brown v. Henderson*, 257 F.3d 246,

254-55 (2d Cir. 2001) (discussing "equal opportunity harasser" defense in context of gender-

based claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.*); *see*

*also Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007); *Steiner v. Showboat*

*Operating Co.*, 25 F.3d 1459, 1463-64 (9th Cir. 1994). Those issues, at least here, cannot be

resolved on summary judgment.

In any event, after reviewing all of the affidavits, deposition transcripts and exhibits, and

resolving all ambiguities and drawing all reasonable inferences in the Wentworths' favor as I

must, I find that the Wentworths have sustained their burden of establishing a prima facie case

---

[12] The one instance where Mr. Hedson harassed one of Mrs. Wentworth's white students
does not warrant summary judgment. Defs' Br. at 15. From all the evidence a jury may
reasonably conclude either that this harassment occurred after the parties' relationship had
deteriorated such that Mr. Hedson was "raging" against all of the Wentworths' visitors, or that
one instance of harassment against a white student does not mean that the Hedsons were not
discriminating against the Wentworths' minority students.

under 42 U.S.C. § 3604(c). This is a classic case of "he said, she said." The Wentworths claim

that the Hedsons directed virtually all of their harassment toward the Wentworths' minority

students. The Hedsons dispute the claim. The parties respective factual positions are supported

by their affidavits and deposition testimony. There are no smoking guns in the documents[13] or

obvious admissions in the deposition testimony or affidavits. While the evidence the

Wentworths have put forth may be circumstantial, the issue simply cannot be decided on

summary judgment as there exist genuine issues of material fact in dispute. Reasonable minds

could differ on whether the Hedsons' statements would lead an ordinary listener to believe that

the Hedsons' actions were motivated by discrimination.[14]

Because the Wentworths have established a prima facie case of discrimination, the

burden now shifts to the Hedsons to assert a legitimate, nondiscriminatory reason for their

actions. *Mitchell*, 350 F.3d at 47.

b.      Proffered Nondiscriminatory Reasons And Pretext

---

[13] The Hedsons' argument regarding Djed Wade's letter is misplaced. Defs' Br. at 13-14. It makes no difference whether Mr. Hedson said to Mr. Wade and his daughter that (1) they "were not welcome" or (2) they could "be arrested for taking voice lessons in [the] apartment." It is also irrelevant that Mr. Wade chose not to file his own lawsuit against the Hedsons for such conduct. What matters is that Mr. Hedson spoke to the Wades "at the top of his voice" and denied them access to the apartment. If, as the Wentworths claim, Mr. Hedson treated the Wades differently than the Wentworths' white students, that would be enough to raise an inference of discrimination.

[14] In determining whether statements indicate impermissible discrimination, a court must ask whether the statements suggest a racial preference to an ordinary listener. *See Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991). The ordinary listener "is neither the most suspicious nor the most insensitive of our citizenry." *Id.* at 1002.

Defendants have proffered a purportedly legitimate, nondiscriminatory reason for their

actions – the Wentworths breached the provisions of their lease and ran a vocal studio out of the

apartment. Defs' Br. at 15.[15] Of course, the defendants' burden in this regard is one of

production, and not proof. *E.g., Texas Dept. of Cmty. Affairs*, 450 U.S. at 257 ("the employer

need only produce admissible evidence which would allow the trier of fact rationally to conclude

that the employ decision had not been motivated by discriminatory animus."); *Dister v.*

*Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (defendant "is required to

articulate-but not prove-a legitimate, nondiscriminatory reason"). While the Wentworths

challenge the sufficiency of the Hedsons' factual assertions, suffice it to say that the Hedsons

have satisfied their minimal burden of proffering a nondiscriminatory reason for their actions.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) ("[The burden of

providing a legitimate, nondiscriminatory reason] is one of production, not persuasion; it can

involve no credibility assessment.") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509

(1993))).[16]

---

[15] The Hedsons also argue that the Wentworths breached their lease in a number of other ways. *E.g.*, Defs' Br. at 18 ("Plaintiffs also violated the terms of their lease by performing alterations in the bathroom without the written consent of the landlords."). Those breaches, however, appear to be the basis only for the eviction proceeding, and not the alleged harassment of the Wentworths and their students. In any event, because the main proffered legitimate, nondiscriminatory reason for the Hedsons' action is the alleged running of the vocal studio out of the Wentworths' apartment, and that is sufficient in and of itself to satisfy the Hedsons' burden of production, I will not elaborate on the other proffered reasons.

[16] Before addressing the issue of pretext, I turn to a factual argument defendants make in support of their claim that they have legitimate, nondiscriminatory reasons for their actions. While this argument does not affect the outcome of the instant motion, it deserves some attention. The Hedsons argue that their nondiscriminatory motivations are evident from the fact that they previously rented the apartment to "Hispanics." *Id.* at 19. That the Hedsons may have rented the apartment in the past to a *Hispanic* couple is hardly conclusive evidence that they did

17

Although the Hedsons have proffered a nondiscriminatory reason for their actions, a jury

could reasonably conclude that the proffered reason is pretextual and that discrimination is the

real reason.  Pointing to the timing and context of the conduct at issue, plaintiffs argue that the

issue must be decided by a jury:

> Defendants' statements must, then, be analyzed in the context of the Complaint's
> essential allegations that Jordan Wentworth taught voice lessons in the apartment
> for years and received no complaints from the defendants or Elissa Maloney, their
> neighbor, until some of her students started showing up black.  This essential fact
> both provides context for the interpretation of facially nondiscriminatory
> statements, and constitutes evidence from which a jury could find an intent to
> discriminate.

Pls' Br. at 6; *see also id.* at 9 ("Defendants' argument ignores the Complaint's fundamental

allegation that nobody complained about Jordan's giving voice lessons in the apartment until she

enrolled several new students who were black.").  While the issue of pretext cannot be resolved

on summary judgment based on the allegations in the complaint, I agree that plaintiffs have

come forth with sufficient evidence of pretext to survive summary judgment.

It is undisputed that virtually all of the parties' negative interactions occurred

contemporaneously with or immediately after a black student's voice lesson.  Timing alone may

be sufficient to establish pretext.  *O'Neal v. State University of New York*, No. 01 Civ. 7802

---

not discriminate against the Wentworths because they associated with persons of *African
American* or *African Caribbean* descent.  While it may be true that evidence of past minority
tenants *may* refute a claim of discrimination, that is only so where the former tenants are of the
same race as the current tenants.  *Sassower v. Field*, 973 F.2d 75, 77 (2d Cir. 1992) (evidence
that defendants rented apartments to tenants of *same* race and gender as plaintiffs *tended* to
refute claim of discrimination).  Thus, the fact that the Hedsons may have rented the apartment
to a Hispanic couple is not, as the Hedsons claim, "[m]ost damaging to plaintiffs."  Defs' Br. at
19.  Similarly, that Mr. Hedson may have worked for the Department of Homeless Services has
no bearing on whether he or Mrs. Hedson discriminated against the Wentworths because they
entertained blacks in their apartment.

(DGT), 2006 WL 3246935, at *15 (E.D.N.Y. Nov. 8, 2006) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)).  Here, however, plaintiffs have more than mere timing upon which to rely.  Reasonable inferences which could be drawn from the content and context of the Hedsons' statements, the fact that the Hedsons permitted the Wentworths to operate a voice studio out of the apartment for years without ever harassing any of Mrs. Wentworth's white students or asking the Wentworths to leave, plus the fact that the Hedsons harassed only one of the Wentworths' white students after the relationship had soured beyond repair, could lead a reasonable jury to conclude that the proffered reasons for the Hedsons' actions were pretextual, and that the real reason was unlawful discrimination.  *See, e.g., Schnabel v. Abramson*, 232 F.3d 83, 89 (2d Cir. 2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); *Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675, 678 (D. Vt. 2005) (timing of eviction and statements in eviction letter could lead reasonable jury to conclude lease violation was pretext and unlawful discrimination was real reason for discrimination).

Accordingly, plaintiffs' claim under section 3604(c) survives summary judgment.

2.      Plaintiffs' Claim Under 42 U.S.C. § 3617

Summary judgment cannot be granted on plaintiffs' claim under section 3617 for the same reasons, and an extended discussion is unnecessary.  While defendants argue strenuously that the plaintiffs' version of events is false, and that their version of events is true, they ignore the fact that the parties' respective positions are supported by deposition testimony and

affidavits; thus, there are genuine issues of material fact in dispute. As plaintiffs note, "[i]t is abundantly clear that this case involves two diametrically opposed versions of what happened, a dispute that can only be resolved at trial." Pls' Br. at 13. Ultimately, it is for a jury to decide given all the facts, assessing the parties' credibility, and drawing all reasonable inferences where appropriate, whether there is sufficient proof of discrimination, a legitimate, nondiscriminatory reason for the Hedsons' actions, and/or pretext.[17]

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied. As discovery is completed, the parties are directed to file a joint pretrial order, proposed voir dire and requests to charge, and any motions *in limine* or pretrial memoranda no later than August 17, 2007. The trial in this case will commence on September 17, 2007 at 9:30 a.m.

Dated: Brooklyn, New York
June 26, 2007

*Ramon E. Reyes, Jr.*

**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**

---

[17] Defendants have not separately addressed plaintiffs' claims under 42 U.S.C. § 1982 and New York Exec. Law § 296, and the prima facie elements of those claims do not differ substantially from those applicable to plaintiffs' FHA claims. *See Mitchell v. Shane*, 350 F.3d 39, n.4 (2d Cir. 2003) (housing discrimination claim under N.Y. Exec. L. § 296 evaluated under same framework as FHA claim); *Huertas v. East River Housing Corp.*, 674 F. Supp. 440, 454 (S.D.N.Y. 1987) (applying the elements of a prima facie FHA claim to claim under § 1982). Therefore summary judgment must also be denied on those claims.

20